Donna M. Strain, Bar No. 305599
DStrain@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105-3204
Telephone:    415.344.7000
Facsimile:    415.344.7050

Jon B. Jacobs (*pro hac vice pending*)
PERKINS COIE LLP
700 13th Street, NW, Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200

Adam L. Marchuk (*pro hac vice pending*)
Mark T. Smith, Bar No. 260845
Caroline A. Teichner (*pro hac vice pending*)
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603-5559
Telephone: (312) 324-8400

Attorneys for Plaintiff
LOCATION SERVICES, LLC

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOCATION SERVICES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DIGITAL RECOGNITION NETWORK, INC., <br><br> Defendant. | Case No. <br><br> **PLAINTIFF'S COMPLAINT AGAINST DIGITAL RECOGNITION NETWORK, INC.** <br><br> DEMAND FOR JURY TRIAL |

For its Complaint against Defendant Digital Recognition Network, Inc. ("DRN"), Plaintiff Location Services, LLC ("Location Services") states and alleges as follows:

## I.    JURISDICTION

1.    Location Services brings this Complaint under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), Section 4 of the Clayton Act (15 U.S.C. § 15), as well as causes of action arising under California law.  The Court has subject-matter jurisdiction over this action

1   pursuant to 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. §§ 4 and 15.  DRN's sale of LPR data

2   used for vehicle repossession and recoveries and its exclusionary non-competition provisions

3   challenged in this lawsuit substantially affect, and are in the flow of, interstate trade and

4   commerce.  This Court has supplemental jurisdiction over the state-law claims pursuant to 28

5   U.S.C. § 1367 because those claims are so closely related to the federal claims that they form part

6   of the same case or controversy.

7        2.    DRN is subject to the personal jurisdiction of this Court.  DRN conducts business

8   in this District by, among other things, selling LPR data for the repossession and recovery of

9   vehicles in this District and by contracting with vehicle repossession agents in this District.

10  **II.    NATURE OF THE ACTION**

11       3.    Plaintiff Location Services brings this action to stop Defendant DRN from

12  continuing to violate the antitrust laws by unlawfully maintaining its monopoly power in the

13  market for license plate recognition ("LPR") data used for vehicle repossessions and recoveries.

14  DRN has effectively prevented its vehicle repossession agents, the collectors of LPR data, from

15  terminating their contracts with DRN and working with its competitors, thus foreclosing a

16  substantial percentage of the agents that Location Services needs to compete effectively in the

17  market.

18       4.    LPR data is information about where and when a particular license plate was

19  spotted.  It is collected by vehicle repossession agents that attach LPR kits (comprising

20  sophisticated cameras and specific software) to their fleet of tow trucks and spotter cars.  LPR

21  data is then uploaded into a database and cross checked against lists of license plates from

22  vehicles sought by banks and other lienholders.  Using LPR data is the most effective way to

23  locate a vehicle when it cannot be found using traditional investigation methods known as "skip

24  tracing."  A significant, and growing, percentage of vehicle repossessions are made using LPR

25  data.

26       5.    By any measure, DRN has long been the dominant provider of LPR data used for

27  vehicle repossessions and recoveries.  DRN has contracts with over 70% of the vehicle

28  repossession agents currently operating LPR kits on their tow trucks and spotter cars.  DRN's

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

agents tend to be larger and operate a greater number of trucks and spotter cars, each of which is equipped with an LPR kit.  For that reason, DRN's percentage of the total number of LPR kits currently on the market collecting data is even higher—over 80%.  DRN also possesses a far larger historical LPR database than any other competitor.  Its website currently boasts of 6.5 billion "total vehicle sightings."  *See* http://drndata.com/.  That represents over 70% of the historical LPR data collected in the market.  In 2017, DRN added 1.7 billion scans to that database.  *See*  http://drndata.com/drn-vehicle-recovery-hotlist-grows-360000-company-marks-milestone-2-billion-asset-value-recovered-2017-lenders/.  That figure represents over 70% of the LPR data collected in the overall market that year.

6.      DRN's dominance stems from its large network of vehicle repossession agents and its prohibition against those agents working with competing LPR providers for a full year after they terminate their contract.  Any agent wishing to terminate with DRN is forced to lose, for an entire year, the substantial amount of money it had been earning by collecting LPR data and repossessing vehicles using that data.  As a result, agents are not willing to leave DRN's network.

7.      On information and belief, many of DRN's agents would terminate their contracts if they were not forced to forego that substantial income for the year following termination. Many of these agents have become dissatisfied with DRN's policies on various issues, including those relating to their ability to access and use LPR data they have collected themselves.  DRN has also taken advantage of its dominant position in the market to increase the fees it charges to lienholders for LPR data.

8.      Under new ownership, Location Services recently has been focused on providing the market with what it has needed for many years:  more competition.  Location Services plans to partner with its repossession agents on more favorable terms compared to those imposed by DRN.  It also plans to offer lienholders a unique "one-stop shopping" suite of services that includes LPR data along with other services.

9.      But obtaining a sufficiently large database of recent LPR data is a prerequisite for executing these plans.  And DRN's noncompetition restriction forecloses Location Services from a substantial share of the vehicle repossession agents it needs to build that database.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

10.     DRN's non-competition provision is not necessary to protect any of DRN's proprietary data or intellectual property.  Rather, the intent and effect of these restrictions has been to maintain DRN's monopoly power in the market.  The result has been less competition, higher prices, fewer choices, reduced output, and lower quality service for lienholders.

## III.     THE PARTIES

11.     Plaintiff Location Services is a Delaware limited liability company having its principal place of business at 2365 Iron Point Road, Folsom, CA 95630.

12.     On information and belief, Defendant DRN is a Delaware corporation having its principal place of business at 4150 International Plaza, Suite 800, Fort Worth, Texas 76109.  DRN is a majority owned subsidiary of Vigilant Solutions, Inc.  On information and belief, Vigilant Solutions, Inc.'s principal place of business is Livermore, California.

## IV.     VENUE

13.     Venue is proper in this Court under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26.  Location Services' principal place of business is in this District and Location Services has been harmed in this District.

## V.     OVERVIEW OF THE VEHICLE REPOSSESSION INDUSTRY

### A.     Lienholders, Forwarding Companies, and Vehicle Repossession Agents All Value LPR Data.

14.     The vehicle repossession industry has three main categories of participants (excluding the consumers whose vehicles are subject to repossession):

- lienholders / forwarding companies (LPR data buyers),
- vehicle repossession agents (LPR data collectors), and
- LPR data aggregators and providers (like DRN).

15.     *Lienholders*. Many different entities are involved in financing the purchase of automobiles in this country.  They range from large banks to small independent finance companies.  Some lenders are national, while many more are local.  The 2017 Manheim Used Car

Market Report (the "Manheim Report") estimated that the value of outstanding auto loans in 2016 was $1.1 trillion and growing:



16.     These banks, finance companies, and other providers of auto loans (together referred to as "lienholders") typically assume a "purchase money" security interest in the vehicle purchased by the consumer.  If the consumer defaults on the loan, the lienholder may attempt to repossess the vehicle and then sell the vehicle to recoup part of the outstanding loan amount.  The Manheim Report estimated that 3.7 million outstanding auto loans were more than 90 days delinquent.  It is estimated that more than 1.8 million vehicles will be repossessed in the United States this year alone.

17.     The complications related to locating and repossessing vehicles have given rise to the vehicle repossession industry.  Although locating a target vehicle is sometimes not difficult (*e.g.*, when it can be found at the consumer's home and the customer voluntarily surrenders the vehicle), sometimes the target vehicle can be hard to find.  Given that consumers can move their

1  vehicles frequently and some consumers may attempt to avoid repossession, locating target

2  vehicles can become time consuming and expensive.

3       18.     Since it was introduced approximately ten years ago, LPR data has been changing

4  the way hard-to-find vehicles are located.   As used in this Complaint, "LPR data" consists of

5  photographic images of vehicle license plates and various pieces of information related to each of

6  those images, including the license plate number, a GPS coordinate of the location where the

7  photo was taken, and the time and date when the photo was taken.

8       19.     LPR data consists solely of publicly observable information.

9       20.     LPR databases typically consist of millions (or, in the case of DRN's database,

10  billions) of pieces of LPR data collected in a variety of geographic areas over long periods of

11  time.   Aggregating LPR data on this scale is valuable information not generally obtainable by

12  traditional methods.

13       21.     LPR data can help to more efficiently locate a target vehicle.   For example, if LPR

14  data indicates that a target vehicle has been spotted numerous times in the same three block

15  radius, a vehicle repossession agent may be able to narrow its search accordingly.

16       22.     Collecting LPR data is also potentially useful in near real time.   As LPR data is

17  being gathered, computer software can cross reference that data against a list of vehicles approved

18  for repossession by a lienholder.   If there is a "hit," the vehicle repossession agent may then

19  repossess the vehicle immediately (after an appropriate approval process).

20       23.     Lienholders increasingly rely upon LPR data, and access to an LPR database, to

21  expedite the process of locating and repossessing target vehicles, especially hard-to-find vehicles.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

24.     DRN advertises on its website (*see* http://drndata.com/) that lienholders can recover up to 35% more vehicles by using LPR data:



# Auto Recovery

Our vehicle location data has revolutionized the auto recovery industry by helping lenders recover up to 35% more vehicles.

25.     Accordingly, LPR data has value to lienholders, who seek to locate, repossess, and resell target vehicles quickly and efficiently.

26.     ***Forwarding Companies***.  Lienholders may hire forwarding companies, which are entities that specialize in managing active repossession orders on behalf of lienholders and work directly with vehicle repossession agents.

27.     Lienholders may prefer to work with a forwarding company to reduce their administrative burdens.

28.     Lienholders typically have practices and procedures in place with respect to repossessing vehicles from consumers in default (*e.g.*, form paperwork, authorization protocols, etc.).  It may be easier to ensure that one forwarding company (or a small number of forwarding companies) is familiar with and implements those practices and procedures, rather than conveying that information to potentially hundreds of different vehicle repossession agents and then policing their compliance.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

29.     To attract work from lienholders, forwarding companies strive to demonstrate their ability to find and repossess a large number of vehicles quickly and efficiently.  That means forwarding companies are motivated to repossess as many vehicles on the lienholders' target list as quickly and efficiently as possible.  For similar reasons that LPR data is valuable to lienholders, it is equally valuable to forwarding companies seeking to serve the lienholders.

30.     On information and belief, the more target vehicles a forwarding company can help repossess, the more money the forwarding company makes.

31.     Because LPR data helps forwarding companies more efficiently repossess more target vehicles, LPR data is valuable to forwarding companies.

32.     ***Vehicle Repossession Agents***.  Vehicle repossession agents are companies that specialize in locating and repossessing target vehicles.  Locating target vehicles has traditionally been accomplished by "skip tracing," a term originating from the phrase "to skip town."  Skip tracing involves trying to locate a vehicle at the consumer's home or work address, conducting interviews of persons who might know of the vehicle's whereabouts, and through surveillance.

33.     For hard-to-find vehicles, skip tracing is difficult and inefficient.  LPR data allows vehicle repossession agents to supplement their vehicle recovery process by finding, and therefore repossessing, target vehicles faster and more efficiently.  For example, LPR data can provide information that a target vehicle was spotted in a different state.  With traditional skip tracing, however, if a defaulting consumer "skips" town with the target vehicle, locating the target vehicle requires investigating where the defaulting consumer may have gone, which may be difficult and time consuming.  LPR data thus provides a powerful tool to find what would traditionally have been a hard-to-find vehicle.

34.     On information and belief, vehicle repossession agents can recover 15% more vehicles with LPR technology.  The more vehicles an agent can find and repossess, the more money the agent can make.  Agents can earn significantly more revenue as a result of using LPR technology.

35.     Vehicle repossession agents desire to have strong and broad relationships with lienholders and forwarding companies because those entities control the list of vehicles subject to

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

1  repossession.   Ultimately, lienholders and forwarding companies are a source of revenue for

2  vehicle repossession agents.

3      36.    Lienholders and forwarding companies demand to work with vehicle repossession

4  agents that use LPR technology.  This has been true since DRN introduced LPR technology to the

5  market in 2009.  Shortly thereafter, DRN was touting in a May 4, 2009 email (which was publicly

6  disclosed as part of a prior lawsuit) that LPR data provides a "Unique Competitive Advantage" to

7  vehicle repossession agents because "[l]enders want to work with recovery agents who utilize

8  LPR technology."

9      37.    Because lienholders and forwarding companies prefer working with vehicle

10  repossession agents who collect LPR data, many vehicle repossession agents want to use LPR

11  technology as a selling point to the lienholder or forwarding company.

12      38.    Further, to increase the chances of securing future work, vehicle repossession

13  agents seek to provide positive results to lienholders and forwarding companies by closing

14  repossession orders quickly and efficiently.  Access to LPR data helps achieve this goal because

15  that data helps them to find and repossess hard-to-find vehicles more quickly and efficiently.

16      39.    Not all companies with tow trucks use LPR technology.  On information and

17  belief, the number of vehicle repossession agents currently using LPR technology is

18  approximately 800.  The total number of companies involved in any way with vehicle

19  repossession and recovery in the United States is probably closer to 3,000.  There are several

20  reasons why many of these companies do not use LPR technology, and have no desire to do so,

21  including the following.

22      40.    *First*, many of the 3,000 tow truck companies in the United States do not focus on

23  vehicle repossession and recovery services as their primary business.  In fact, according to North

24  American Industry Classification System ("NAICS") data, there are only 803 companies in the

25  United States that describe their primary business as repossession services.[1]  LPR kits are

26

27  ─────────────────────────
   [1]  NAICS Code 561491 for repossession services companies is defined as: "This U.S. industry
28  comprises establishments primarily engaged in repossessing tangible assets (e.g., automobiles,
   boats, equipment, planes, furniture, appliances) for the creditor as a result of delinquent debts."

1    relatively expensive.  DRN sells its kits, each one designed to be used on a single tow truck or

2    spotter car, for approximately $15,000.  If a company's primary business is simple roadside

3    assistance or towing vehicles to repair shops, for example, it does not make economic sense for

4    the company to invest in purchasing LPR technology, training their drivers to use the cameras so

5    they are properly mounted and adjusted, and working with LPR data providers, lienholders, and

6    forwarding companies.

7    41.   *Second,* many repossession agents, even those that do prioritize vehicle

8    repossession and recovery, are very small companies and operate only one or a few tow trucks.

9    According to NAICS data, of the 803 companies reporting repossession as their primary business,

10   457 of them have fewer than five employees:

## NAICS Code

| NAICS Code | Description | Records |
|---|---|---|
| 561491 | Repossession Services | 803 |
| Total | | 803 |

## SIC Code Extended

| SIC Code | Description | Records |
|---|---|---|
| 738998 | Repossessing Service | 803 |
| Total | | 803 |

## Employee Size

| Employee Size | Records | Percentage |
|---|---|---|
| 1-4 | 457 | 56.91 |
| 5-9 | 224 | 27.9 |
| 10-19 | 81 | 10.09 |
| 20-49 | 30 | 3.74 |
| 50-99 | 7 | 0.87 |
| 100-249 | 1 | 0.12 |
| 250-499 | 1 | 0.12 |
| Unknown | 2 | 0.25 |
| Total | 803 | 100 |

27   For the vast majority of repossession agents of that size, the substantial costs of investing in LPR

28   technology are greater than the expected benefits.  As a result, they focus their businesses on

1    performing solely skip tracing services.

2        42.    *Third,* many repossession agents, especially many of the smaller ones, are located

3    in rural areas, where it does not make sense to use LPR technology.   An extremely high

4    percentage of LPR data is collected in urban areas, where there are simply more license plates to

5    scan.   In rural areas, the vast majority of agents limit their business to providing skip tracing

6    services.  Even if agents in rural areas tried using LPR technology, they would not be attractive to

7    LPR data providers, lienholders, or forwarding companies because they would not be gathering

8    nearly as much data as agents operating in LPR-dense urban areas.

9        43.    **LPR Providers**.  LPR providers, like DRN and Location Services, sell LPR data to

10   lienholders and forwarding companies.   LPR providers can sell LPR data to lienholders or

11   forwarding companies generally in two ways.

12       44.    *First*, LPR providers can sell access to an LPR database, which includes historical

13   LPR data.  As new repossession orders are created, the new target vehicles can be cross checked

14   against the historical LPR data to assess whether there are any hits.  If there are, that information

15   can be shared with vehicle repossession agents as another data point that the agent can use to

16   locate and repossess the vehicle in question.

17       45.    The larger the LPR data inventory an LPR provider can offer, the more willing a

18   lienholder or forwarding company will be to pay to access the LPR database (and more likely to

19   pay a more competitive rate).

20

21

22

23

24

25

26

27

28

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

46.     For example, a publicly available July 2015 agreement between DRN and a forwarding company discloses a subscription fee to DRN's LPR database that costs a minimum of $4,000 per month, with the price going up depending on how many repossessions the forwarding company achieves using the LPR data:

**SCHEDULE 2**
**LPR SUBSCRIPTION FEES**

1.     The following schedule is entered into on July 1, 2015, between Digital Recognition Network, Inc., a Delaware corporation ("DRN"), and Burns National, LLC, a Michigan limited liability company ("Customer"), and is incorporated into the Master Services Agreement between DRN and Customer dated July 1, 2015.

2.     **Fees.** The following fees are payable under this Agreement:

      (a)    **DRN LPR Subscription Fee.** The DRN LPR Subscription fee provides Customer with:

            (i) access to DRN Vehicle Data for the year prior to the date of the Valid Purchase Order was submitted through the DRN System for the particular VIN listed in the Valid Purchase Order;

            (ii) access to the DRN Vehicle Data for the particular VIN listed in the Valid Purchase Order through the DRN System as long as the Valid Purchase Order remains open in the DRN System; and

            (iii) the option to list the particular vehicle identified in the Valid Purchase Order in the DRN LPR "hotlist" managed within the DRN System.

      The DRN LPR Subscription fee is based on (i) a minimum monthly floor of $4,000 (based upon unlimited VINs uploaded by Customer) and (ii) a monthly performance fee based on the number of Customer's recoveries in a given month obtained via the DRN System, ("DRN Recoveries.") The monthly performance fee will be paid in those months in which the DRN Recoveries exceed 25, and will be calculated at $185 per DRN Recovery that exceeds 25. Customer will provide DRN monthly reporting that includes the number of DRN Recoveries and the DRN Affiliate responsible for the DRN Recovery.

47.     *Second*, LPR providers can sell LPR data that "hits" on an open repossession order from the lienholder or forwarding company.  As new LPR data is collected, it can be cross checked against a list of open repossession orders to assess whether a target vehicle has just been spotted.  If it has, the LPR provider makes this specific information available to the lienholder or forwarding company as a potential repossession.  On information and belief, the fees for this kind of specific LPR data vary because they are negotiated separately with each individual lienholder

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

or forwarding company, although payment for an LPR "hit" is contingent upon the repossession of the target vehicle.

48.     The more LPR data that is continually obtained, the more likely a "hit" will occur, allowing the LPR provider to sell specific LPR data corresponding to open repossession orders.

49.     Further, the more LPR data that is obtained every month, the more the LPR provider's historical LPR database continues to grow, making it more attractive to lienholders and forwarding companies.

50.     In general, more recent LPR data is more valuable than older LPR data for locating and repossessing vehicles.  Information that a target vehicle was spotted in a particular location one week ago is much more valuable than information about that vehicle's whereabouts six months ago.  For that reason, lienholders and forwarding companies value more than just the overall size of an LPR provider's historical database.  The amount of data added to that database every month is also critical because that is a better measure of the volume of more recent data.

51.     In sum, the key to competing successfully in this market is continually obtaining a large volume of LPR data, particularly more recent data.

**B.     A Strong Network of LPR Data Collectors in LPR-Dense Metropolitan Areas is Critically Important to LPR Providers.**

52.     To obtain LPR data, LPR providers recruit vehicle repossession agents.

53.     A vehicle repossession agent's fleet of trucks and spotter cars can be outfitted with LPR kits to gather LPR data.  LPR kits generally consist of LPR cameras, which are high-speed cameras for obtaining license plate images, and LPR software, for translating the images into LPR data.

54.     It is particularly important for LPR data providers to develop a strong network of vehicle repossession agents using LPR technology in larger metropolitan areas.  Those areas have far greater numbers of license plates to scan, so those areas are where it makes sense for repossession agents to operate LPR kits.  For that reason, small tow-truck companies located in rural areas, where there are far fewer vehicles (and therefore far fewer sought-after vehicles), are not adequate substitutes.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

55.     DRN recognizes the importance of collecting data in LPR-dense metropolitan areas. On its website, it promotes itself as "cover[ing] every major metropolitan area in the United States . . . ." *See* http://drndata.com/federal-judge-rules-in-favor-of-drn/. Further, based on DRN internal documents produced in a prior lawsuit, DRN has touted that its agents cover "all of the major metropolitan areas 24/7."

56.     Other companies with a fleet of cars, such as taxi services, are not realistic alternatives to a network of vehicle repossession agents.  Because of the expense of LPR kits, the only companies that purchase such technology are those that are compensated for actually repossessing vehicles.  Because taxicabs cannot do that, they do not purchase LPR kits.

57.     Larger vehicle repossession agents, such as those with 15 or more tow trucks and spotter cars, are particularly valuable to LPR data providers.  These larger, "high value" agents have the financial resources to purchase a large number of LPR kits.  Many operate over broad geographic areas, often across several states, and in several urban and more populated areas that are LPR-dense geographies.

**C.     DRN's Network of LPR Data Collectors is Expansive.**

58.     In 2009, DRN became the first company offering LPR data for vehicle repossession and recovery.  In a May 4, 2009 email publicly available from a prior lawsuit, DRN advertised that it was "the exclusive provider of License Plate Recognition (LPR) technology and services to the asset recovery industry."   When DRN was the only LPR provider available, vehicle repossession agents desiring to use LPR technology had no real choice but to begin working with DRN.  By May 4, 2009, DRN states that it had already "developed a network of more than 350 LPR cameras."  On information and belief, that is more than all DRN competitors have in circulation today, combined.

59.     DRN began imposing its non-competition restrictions on its agents at or near the time it entered the market.  Once agents signed their contracts with DRN, they were prohibited from working with any competing LPR provider for a full year after termination.  That restriction deterred agents from terminating, allowing DRN to continue growing its agent network.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

**D.      Location Services and its Plans to Expand into the Market.**

60.      Plaintiff Location Services has offered LPR data for vehicle repossession and recovery for many years under its predecessor's name, PRA Location Services.  PRA Location Services and FindJohnDoe, were acquired in June and July 2017, respectively, by Location Services LLC, and its affiliate, the parent company of which is Location Services Holdings, LLC.  Location Services LLC is a repossession management and loss-mitigation services company with a strategic focus of driving value through partnership.

61.      Location Services intends to expand its presence in the market significantly, to offer lienholders a unique "one-stop shopping" suite of services and offer vehicle repossession agents flexibility and competitive pricing.

62.      Location Services' suite of services available to lienholders will include LPR data, skip tracing services, forwarding company services, as well as post-repossession recovery services.  Location Services believes that lienholders would greatly value purchasing such a broad array of services from a single company.

63.      Locations Services will provide LPR kits to its agents at approximately half the price that DRN charges.  Location Services' LPR kits are technologically equivalent, if not superior to, the LPR kits DRN provides.  The combination of lower-priced LPR kits and higher incentives is likely to lead to agents buying more cameras and working harder to collect more data.

64.      One way in which Location Services will treat its agents (and lienholders) better relates to situations in which lienholders provide repossession orders directly to agents (and not through the LPR data provider).  Unlike DRN, Location Services will not charge either the agent or the lienholder additional fees when this occurs.

65.      But obtaining a sufficiently large database of recent LPR data is a prerequisite for these plans.  If Location Services cannot compete successfully with DRN to provide LPR data to lienholders, then it cannot offer the comprehensive set of services to lienholders, and the increased flexibility to agents, that it believes the market is demanding.  Obtaining a sufficiently large and dynamic LPR database, in turn, depends on gaining access to a sufficient number of

vehicle repossession agents, especially larger, high-value agents, of which a very high percentage are currently under contract with DRN and subject to its overly restrictive non-competition clause.

66.     Therefore, Location Services has filed this antitrust lawsuit to enjoin DRN's enforcement of its exclusionary non-competition restrictions which have unlawfully maintained its monopoly power in the relevant market.

## VI.     THE RELEVANT PRODUCT MARKET

67.     The relevant product market is LPR data used for vehicle repossessions and recoveries.

68.     LPR data is not functionally interchangeable with skip tracing.  LPR data is generated by LPR kits attached to a vehicle repossession agent's fleet of tow trucks and spotter cars.  Skip tracing does not involve cameras or computers.  When agents use LPR kits, they drive through busy streets and parking lots so they can scan more vehicles and create more LPR data.  When agents use skip tracing, they drive to specific addresses looking for specific vehicles.

69.     Skip tracing is not a reasonable substitute for LPR data.  Rather, most lienholders and forwarding companies view LPR data as an added complement to skip tracing, particularly when initial attempts to locate a vehicle through skip tracing have failed.  For easy-to-find vehicles, skip tracing may be acceptable and even preferable to paying the fees associated with relying on LPR data.  On information and belief, a majority of vehicle repossessions are still made solely through the use of skip tracing.  Many target vehicles can be found quickly at or close to the owner's last-known home or work address.  But if skip tracing does not work quickly, the most efficient and economical method for finding a vehicle is through the use of LPR data.  If the owner has moved to a different city or state, skip tracing will likely be unsuccessful.  LPR data, which can be provided on a nationwide basis, is a far superior method for finding such a vehicle.

70.     The percentage of vehicle repossessions made using LPR data is significant, and it is growing.  Lienholders and forwarding companies are increasingly demanding that vehicle repossession agents to which they assign orders use LPR kits.  Likewise, a substantial number of

vehicle repossession agents desire to work with an LPR data provider. An agent located in an urban area, close to many other agents, will not be able to compete effectively for harder-to-find vehicles without the use of LPR data. On information and belief, many vehicle repossession agents using LPR kits rely on LPR data for a substantial percentage of their repossessions.

71. Demand for LPR data is inelastic. The cross-elasticity of demand between LPR data and skip tracing methods is low. DRN charges thousands of dollars per month for access to its LPR data, fees that lienholders and forwarding companies would not have to pay if they relied on skip tracing alone to locate vehicles. A hypothetical monopolist of LPR data used for vehicle repossessions and recoveries could impose a small but significant and non-transitory increase in price without losing so many sales to skip tracing or other methods as to make that price increase unprofitable.

72. LPR data can be used for purposes other than vehicle repossessions. LPR data can assist law enforcement agencies to locate stolen cars. It can help insurance companies investigate fraud—for example, by determining whether a vehicle is registered in a particular state. Nonetheless, LPR data used for vehicle repossessions and recoveries constitutes a distinct relevant product market. Lienholders and forwarding companies seeking to repossess automobiles and other vehicles are distinct and separate entities from law enforcement agencies and insurance companies seeking data to investigate fraud. LPR data providers negotiate contracts with lienholders and forwarding companies separately from the contracts they negotiate with entities seeking LPR data for other purposes. Therefore, a hypothetical monopolist of LPR data could profitably target the subset of lienholders and forwarding companies seeking LPR data for vehicle repossessions and recoveries for price increases. Those lienholders and forwarding companies could not defeat such a price increase through arbitrage because it would be impossible to obtain the data they need by purchasing it from law enforcement agencies or other users of LPR data.

## VII.   THE RELEVANT GEOGRAPHIC MARKET

73. The relevant geographic market is the United States.

74.    Lienholders and forwarding companies do business throughout the United States. LPR data providers maintain databases with data from scans taken in multiple different geographies across the United States.   Lienholders and forwarding companies purchase nationwide LPR data in order to better locate target vehicles.  And LPR data is used by vehicle repossession agents to locate target vehicles across and throughout the United States.

75.    LPR data providers doing business outside the United States are not reasonable substitutes for those doing business in the United States.  A hypothetical monopolist of LPR data used for vehicle repossessions and recoveries in the United States could impose a small but significant and non-transitory increase in price without losing so many sales as to make that price increase unprofitable.

## VIII.   DRN'S MARKET SHARE AND MONOPOLY POWER

76.    DRN now holds, and has held, monopoly power in this relevant market.  DRN has the power to control prices and has increased prices to lienholders.  It has the power to exclude competitors and, using its overly broad non-competition restrictions, it has prevented them from competing successfully in the relevant market.

77.    DRN is a privately held corporation and does not publish information regarding its market share or annual revenue.  However, it is common knowledge within the industry that DRN is, by far, the largest and most dominant provider of LPR data used for vehicle repossession and recoveries.  Specific factual information regarding the exact extent of DRN's market dominance is exclusively within DRN's control and must be obtained through discovery.

78.    By any measure, DRN has the largest market share in the relevant market, and its share is sufficient under most measures to establish a *prima facie* case that DRN possesses monopoly power.

79.    DRN's share of LPR kits.  DRN's LPR kits represent over 80% of the LPR kits currently on the market collecting data.  The number of LPR kits being operated by an LPR provider's agent network is one of the most important metrics from the viewpoint of lienholders. Their ultimate goal is to find and repossess target vehicles.  A greater number of LPR kits in use, scanning and collecting data, increases the likelihood of target vehicles being located.  On

-18-

information and belief, the number of DRN LPR kits in current use is approximately 2,000. The comparable number for other competitors is 250 (for MVTRAC), 80 (Plate Locate) and 15 (Location Services).

80.     Geographic coverage of DRN's LPR kits. Broad geographic coverage—especially in key LPR-dense metropolitan areas—is also a critical metric because cars are mobile. An LPR data provider with a broad agent network including as many metropolitan areas as possible is more attractive to lienholders because it is more likely that provider will collect data leading to that lienholder's target vehicles. As stated above, DRN promotes itself as operating in "every" major metropolitan area in the country. By contrast, the geographic spread of the agent networks operated by its three competitors is much more limited.

81.     DRN's share of all LPR data. The size of an LPR data provider's database is another metric for measuring its competitiveness in the market. The larger the database, the greater the chance more target vehicles will be found. For example, in an online blog, DRN attributes an increase in the asset value of vehicles recovered to an increase in LPR data collected by its agents. *See* http://drndata.com/drn-vehicle-recovery-hotlist-hits-time-high-300000-license-plate-recognition-lpr-assignments-asset-value-vehicles-recovered-exceeds-eight-billion-dollars/. The size of DRN's database is, by far, the largest in the market. DRN claims to possess 6.5 billion entries of LPR data, representing over 70% of the historical data collected by the market as a whole. On information and belief, the databases of the other three competitors comprise approximately 1 billion (MVTRAC), 600 million (Location Services), and 200 million (Plate Locate) entries.

82.     DRN's share of new data collected every year. Because it is also important for an LPR database to include newer, more up-to-date information, another important metric is the rate at which new data is added to a database every year. In 2017 alone, DRN's agents captured an additional 1.7 billion scans. By contrast, Location Services adds approximately 4.8 million new scans annually—less than 1% of what DRN adds to its database each year. On information and belief, the new data added by DRN every year represents over 70% of all of the data added in the market each year.

83.     <u>DRN's share of vehicle repossessions using LPR data.</u>  On January 12, 2016, a DRN executive (John Nethery, who at the time was DRN's Chief Operating Officer and Chief Financial Officer) testified in a deposition in a lawsuit involving antitrust allegations against DRN.  He was asked to estimate DRN's share of all of the vehicle repossessions using LPR data.  Although Mr. Nethery had the incentive to underestimate DRN's market share, he testified that it exceeded 50%.  Indeed, DRN advertises that its affiliates recovered over 165,000 vehicles in 2017.  *See*  http://drndata.com/drn-vehicle-recovery-hotlist-grows-360000-company-marks-milestone-2-billion-asset-value-recovered-2017-lenders/.  On information and belief, that number accounted for over 60% of all vehicle repossessions using LPR data in 2017.

84.     Absent the relief requested herein, the disparity between DRN's market share and the share of its competitors will likely continue to grow in the future.  As DRN's database gets increasingly larger and reflects more timely and up-to-date information compared to Location Services' database, fewer and fewer lienholders and forwarding companies will be willing to pay subscription fees for access to Location Services' database.

85.     The relevant market has substantial barriers to entry, primarily because of DRN's exclusive practice of imposing overly broad non-competition clauses on its vehicle repossession agents.  The principal barrier to entering the relevant market and competing successfully is the time and expense involved in building a sufficiently large LPR database that will attract the business of lienholders and forwarding companies.  To be a viable competitor, an entrant needs a viable LPR database.  And to get a viable LPR database, an entrant needs a sufficiently large network of vehicle repossession agents using LPR kits, driving around the important LPR-dense geographies and scanning license plates.

86.     Because DRN's agent network is foreclosed from other competitors, other LPR providers are unable to expand their output in the short term and increase their market share.  Because DRN's agent network is so much larger than any other competitor, and because it has locked up so many of the high-value vehicle repossession agents, other LPR providers will only continue to lose market share if DRN's exclusionary non-competition restrictions are not enjoined.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

## IX.    DRN'S WILLFUL MAINTENANCE OF ITS MONOPOLY POWER

### A.    DRN has Imposed Overly Broad Non-Competition Restrictions on Its Agents.

87.    Since it first entered the market, DRN has required its vehicle repossession agents using its LPR kits to agree to work exclusively with DRN, and no other LPR providers, for the term of the contract plus a full year after termination.  In 2014, DRN introduced new agreements with non-competition provisions similarly restricting agent's ability to work with a competing LPR provider for the term of the Agreement plus a full year after termination.  In one such agreement between DRN and one of its agents—and, on information and belief, all others as well—that non-competition provision stated that during the term of the agreement and for a full year thereafter, the agent may not:

> directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by, associated with or in any manner connected with, or render services or advice or other aid to, or guarantee any obligation of, any person or entity engaged in or planning to become engaged in the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries or assisting in debt collection efforts on behalf of municipalities and governmental entities.

88.    This non-competition provision imposes an unreasonably broad restriction on the nature of an agent's work with other companies.  For example, it prevents, for one full year after termination, even a low-level employee of a vehicle repossession agent from rendering any services (such web design) to a company planning to become an LPR provider at some point in the future.  It also prevents a vehicle repossession agent, during the term of the contract and for a full year thereafter, from providing skip tracing services for a competitor that also uses LPR technology.

89.    This non-competition provision has no limitation on its geographic scope.

90.    This non-competition provision is unreasonably broad in its duration.  DRN imposes non-competition provisions on forwarding companies as well, but for much shorter periods of time.  For example, a publicly available contract between DRN and a forwarding company restricts that forwarding company from working with a competing LPR provider for

1  only 90 days after termination.  Like DRN's agents, forwarding companies working with DRN

2  have access to its LPR database.  Unlike those agents, however, forwarding companies cannot

3  assist a competing LPR provider in developing a competitive LPR database.  This differential

4  treatment is further evidence that DRN uses its one-year non-competition provisions with vehicle

5  repossession agents for anticompetitive purposes.

6        91.     There is no pro-competitive justification or legitimate business interest for DRN to

7  impose these non-competition restrictions for a year following an agent's termination.  On

8  information and belief, DRN's vehicle repossession agents are not given access to any

9  confidential information, trade secrets, or financial information that could give competing LPR

10  providers a competitive advantage.  In fact, DRN has hosted a free webinar entitled "The Secrets

11  of LPR: How to Maximize Revenue and Recovery Rates."  On information and belief, that free

12  webinar did not require participants to sign confidentiality agreements.

13        92.     Further, the agreements between DRN and vehicle repossession agents include

14  provisions that require any confidential information be destroyed when the agreement is

15  terminated, or upon DRN's request.  Another provision binds the agent from disclosing any DRN

16  confidential information it may have received even after termination.  So even if agents do

17  receive some sort of confidential information from DRN, they must destroy it and never disclose

18  it to a third party.  Any legitimate DRN business is adequately protected without the need for a

19  non-competition provision.

20        93.     All DRN gives to its agents is access to its software to collect LPR data.  The

21  agents are not given the software's source code.  On information and belief, much, if not all, of

22  the functionality of DRN's software is public information.  For example, DRN has filed for and

23  publicly disclosed a number of patent applications that describe, on information and belief, the

24  functionality of DRN's software.

25        94.     Nothing related to an agent's use of DRN's cameras or software, or their access to

26  DRN's database, can justify a non-competition restriction following an agent's termination with

27  DRN.  If and when an agent's agreement is terminated, its drivers can no longer log into DRN's

28  system and collect data using DRN's cameras.  The cameras become effectively inoperable.  Any

software previously provided to the agent is erased, returned, or otherwise deactivated and worthless. And agents can no longer access any of the LPR data they previously collected while under contract with DRN because all collected LPR data is exclusively in DRN's database, and the agents lose access to DRN's database.

95. In some cases, DRN has only selectively enforced its non-competition restrictions including, as discussed in more detail below, following its antitrust litigation with MVTRAC. On information and belief, DRN has allowed certain agents to "buy" their way out of the non-competition restriction by paying a penalty for allegedly breaching the provision. The fact that DRN has not consistently enforced these provisions is further evidence that they are not necessary to protect its confidential information, trade secrets, or business strategies.

96. On information and belief, DRN is aware that its non-competition provisions are unenforceable as written.

**B.      DRN's Non-Competition Restrictions Have Deterred Its Agents From Leaving DRN's Network and Working with a Competing LPR Provider.**

97. DRN's non-competition restrictions prohibit its agents from terminating their agreements and working, in any capacity, with a competing LPR data provider. For an entire year after termination, an agent is prohibited from working in any capacity (even performing skip tracing services only) with another LPR provider. DRN's restrictions prevent its agents from being "associated with or in any manner connected with, or render[ing] services or advice or other aid to" LPR competitors. Location Services has spoken to one of DRN's high value agents: Bay Cities Recovery, Inc. d/b/a DigitalDog Recovery ("DigitalDog"), a California business with over 75 employees working in California. DigitalDog was very reluctant to even talk to Location Services because of the perceived legal risk and potential retaliation from DRN.

98. In essence, DRN's agents wishing to work with a competing LPR provider are forced to pay a significant price for doing so: they have to forgo all income from collecting LPR data and accessing an LPR database for an entire year. On information and belief, this is a significant price because agents using LPR technology rely on LPR data for a substantial portion of their repossessions and recoveries. They will also experience a significant decrease in overall

1    repossessions for the year because agents typically see an increase of approximately 15% in their

2    total repossessions after they start using LPR technology.   As a result, many DRN agents are

3    likely deterred from even talking to a competing LPR provider about the possibility of

4    terminating their DRN contract.

5            99.      As a result, agents wishing to leave DRN have no viable option unless a competing

6    LPR provider agrees to compensate the agent for their loss of income and further provide

7    assurances to mitigate expected legal action against them by DRN.   For example, DigitalDog

8    desired to terminate its relationship with DRN and recently gave DRN notice of its intent to do so

9    and begin working with Location Services.   But DigitalDog refused to terminate its relationship

10   with DRN unless Location Services agreed to compensate DigitalDog for the losses it would

11   incur as a result of DRN's non-competition provisions and further indemnify DigitalDog against

12   legal action by DRN.

13           100.     Because of these high switching costs, DRN has been able to deter its vehicle

14   repossession agents from terminating their contracts and working with competing LPR providers.

15   On information and belief, the only agents that have terminated with DRN to work with a

16   competing LPR provider are: (a) DigitalDog, which announced its termination on April 11, 2018,

17   after Location Services agreed to its indemnification demands; and (b) certain agents that

18   switched from working with DRN to working with MVTRAC, following the settlement of an

19   antitrust lawsuit that MVTRAC filed challenging, among other things, DRN's non-competition

20   provisions.

21           101.     Although DRN's contracts with its vehicle repossession agents have a 30-day

22   written notice termination provision, in effect those contracts are self perpetuating.   Virtually no

23   DRN agents have been willing to terminate and incur the enormous costs of switching to a

24   competing LPR provider.

25           **C.      DRN has Foreclosed a Substantial Percentage of All Vehicle Repossession
                      Agents in the Market Needed to Build a Competitive LPR Database.**

26

27           102.     DRN's agent network represents a substantial percentage of the vehicle

28   repossession agents in the market needed to build a competitive LPR database.   Because DRN

1   was the first company to introduce LPR technology in this market, it had a "first mover"

2   advantage in its attempt to develop an agent network.  Any vehicle repossession agent wanting to

3   use LPR technology had to work with DRN.  And once those agents began working with DRN,

4   the restrictive non-competition provisions deterred them terminating and leaving DRN's network.

5       103.   Today, on information and belief, DRN has approximately 600 vehicle

6   repossession agents under contract.  That represents more than 70% of the vehicle repossession

7   agents currently using LPR technology.

8       104.   A better measure of the percentage of foreclosure, however, is based on DRN's

9   share of all LPR kits currently in the market gathering data.  Some agents operate much larger

10   fleets of tow trucks and spotter cars than others.  Those agents gather more data than other agents

11   that operate a smaller number of trucks and spotter cars.  Based on the number of kits currently in

12   the market, DRN has foreclosed more than 80% of the agent trucks and cars available to gather

13   LPR data.

14       105.   Agents not currently using LPR technology are not good substitutes for building a

15   competitive LPR database.  As stated above, many of the companies operating tow trucks in the

16   United States are not interested in investing the time and money to purchase LPR kits and train

17   their employees on how to gather LPR data.  Many companies with tow trucks do not focus on

18   providing vehicle repossession and recovery services.  Many are small and unable to afford LPR

19   kits.  Many operate in rural areas where it does not make economic sense to buy costly LPR kits.

20   Some agents not using LPR technology attempted to use it in the past, but gave up when they

21   discovered that the costs of the technology outweighed the benefits to their business.

22       106.   To the extent there are significant numbers of larger vehicle repossession agents in

23   metropolitan areas not using LPR technology, they are not good substitutes for DRN's agents

24   either.  If such agents are not using LPR technology today, it is unlikely that they are willing to

25   use it in the future.  LPR technology has been available in the market for approximately ten years.

26   Shortly after introducing it to the market, DRN began touting it as a "Unique Competitive

27   Advantage" to agents.  On information and belief, virtually all of the repossession agents doing

28   business in large metropolitan areas have heard about these benefits.  The vast majority that have

not started using it already have decided to limit their business, for whatever reason, to performing skip tracing services. Therefore, the vast majority of agents in urban areas that are ready, willing, and able to use LPR technology are already doing so for existing competitors— mostly, of course, for DRN.

107. High-value repossession agents, those operating a large fleet of trucks and spotter cars in important LPR-dense areas, are particularly valuable for a competitor seeking to build an effective LPR database and compete successfully in the market. On information and belief, DRN's non-competition restrictions have foreclosed virtually 100% of those agents to its LPR competitors.

**D.     DRN's Exclusionary Conduct has Maintained Its Monopoly Power in the Relevant Market and Caused Anticompetitive Effects.**

108. DRN's exclusionary non-competition restrictions have unlawfully maintained its monopoly power in the relevant market. But for those restrictions, Location Services would be able to begin developing an effective agent network and compete more successfully in the market.

109. DRN's agents have grown increasingly dissatisfied with various terms it has imposed upon them. For example, DRN's agents used to be permitted to access historical LPR data that they themselves scanned. The agents could cross reference new orders they received from lienholders directly against their own LPR scans to determine whether they had recently scanned the target vehicle. Access to their own LPR scans was very beneficial in these circumstances. DRN changed its policy to prevent agents from accessing and using their own historical data. Moreover, on information and belief, agents have also been upset with DRN's: (a) lack of training; (b) lack of effective assistance when agents need help with its cameras and software; (c) low reimbursement rates it pays to agents when they repossess a vehicle; and (d) lack of transparency about the monies owed to agents under their contracts with DRN.

110. DigitalDog, a high-value vehicle repossession agent, wanted to terminate its contract with DRN for some of these reasons. DigitalDog decided to do so only after Location Services agreed to replace DigitalDog's expected losses resulting from DRN's non-competition

1  provision.  Agreeing to similar terms with a sufficient number of other high-value agents needed

2  to develop a competitive LPR database is not a financially viable strategy for Location Services.

3      111.    MVTRAC has been able to achieve a higher market share than other competitors,

4  but its relative success may actually be further evidence of the importance of being able to

5  compete for the business of the agents in DRN's network.  In 2010, MVTRAC filed an antitrust

6  lawsuit against DRN, alleging some of the same claims alleged herein.  *See MVCONNECT, LLC*

7  *and Recovery Manager Pro, LLC v. Recovery Database Network, Inc., Digital Recognition*

8  *Network, Inc., Todd Hodnett, and Johnnie Cort Dehart*, No. 3:10-cv-1948 (N.D. Tex.) (the "Prior

9  Litigation").  MVTRAC's antitrust allegations survived DRN's motion to dismiss.  *See* Prior

10 Litigation at Dkt. 55.  The case was later dismissed after, on information and belief, the parties

11 entered into a settlement.

12     112.    Since that litigation ended, MVTRAC has grown its market share.    On

13 information and belief, as part of the settlement DRN may have relaxed its non-competition

14 restrictions to permit some of its agents to "buy" their way out of their contracts in order to work

15 with MVTRAC.

16     113.    DRN's non-competition restrictions have excluded Location Services from

17 competing successfully in the market.  It has also resulted in anticompetitive effects, including

18 higher prices and lower output of LPR data.

19     114.    Lienholders and forwarding companies value having access to large amounts of

20 LPR data.  The more data that is generated, the more likely it is that the targeted vehicles they are

21 seeking will be found.  Therefore, the total amount of LPR data being generated in the market is a

22 reasonable measure of "output" in this industry.

23     115.    DRN's exclusionary non-competition restrictions have reduced the output of LPR

24 data in at least two ways.  *First*, they have prevented Location Services and other competitors

25 from generating more data themselves by foreclosing access to the vehicle repossession agents

26 they need to build a large LPR database.  *Second*, they have allowed DRN to impose unfavorable

27 terms on its agents, which have disincentivized those agents from equipping more of their trucks

28 and spotter cars with LPR cameras and thereby generating more data.  Because DRN's agents are

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

effectively prevented from terminating their contracts, they are forced to: (a) pay DRN's high prices (approximately $15,000) for each LPR kit; and (b) accept DRN's terms with respect to issues such as accessing the agent's own historical data. All of that makes it less profitable for agents to buy more cameras, hire more drivers, and work harder by generating more data. Location Services will charge much less for its LPR kits, permit agents to have access to their historical data, and provide greater incentives for agents to work harder and generate more LPR data.

116.   DigitalDog is one example of how DRN's exclusionary policies have reduced its agents' incentives to generate LPR data. DigitalDog, a company with a name virtually synonymous with the use of LPR technology in the industry, was equipping only thirty percent of its fleet (15 of its 45 vehicles) with DRN's cameras because of the expense involved in doing so. Because Location Services will offer much more generous terms, including lower camera prices, DigitalDog currently intends to equip additional vehicles in its fleet with LPR cameras so it can generate more data. On information and belief, other DRN agents have been similarly deterred from buying more LPR kits and generating more data because of DRN's exclusionary policies.

117.   DRN's exclusion of Location Services and other competitors has also enabled it to increase prices to lienholders. For example, in the past lienholders were able to send repossession orders directly to DRN's agents for them to check lists of targeted vehicles against the data they had collected themselves. Lienholders did not have to pay DRN anything if those agents found "hits" and repossessed some of those vehicles. When DRN changed its policy and prevented its agents from accessing and using their own historical data, DRN forced lienholders to pay it a substantial fee to "turn back on" access to historical data for agents that receive direct assignments from the lienholder. That represented a real price increase to lienholders, one that occurred only because of DRN's dominant position in the market. If Location Services is allowed to build an effective LPR database and compete successfully in the market, it will allow lienholders to send repossession orders directly to its agents and will not charge those lienholders fees to allow agents to access their own historical LPR data as DRN does currently.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

118.    As a result of its exclusionary non-competition restrictions, DRN has maintained its monopoly power in the relevant market.   Vehicle repossession agents, lienholders and forwarding companies have been deprived of the benefits of competition, including lower prices, greater output, more choice, and higher quality service.

## X.    INJURY AND HARM CAUSED BY DRN TO COMPETITION AND TO LOCATION SERVICES.

119.    DRN's actions, including its overbroad non-competition provisions and other anticompetitive acts as alleged herein, have effectively deprived rival LPR providers, including Location Services, access to the vast majority of vehicle repossession agents, and in particular high value vehicle repossession agents, available to participate in the relevant market.

120.    DRN's exclusion of its rivals has deprived lienholders and forwarding companies of the benefits of competition, and has resulted in higher prices, loss of choice, reduced output, and lower quality service.

121.    Location Services has also been harmed by DRN's exclusionary acts.   But for DRN's non-competition provisions, Location Services would be able to contract with more high-value vehicle repossession agents, build an effective LPR database with a substantial amount of recent LPR data, and compete with DRN successfully in the relevant market.

122.    By frustrating, delaying, and preventing Locations Services from working with these vehicle repossession agents and competing more effectively, Location Services has lost substantial revenue.

123.    Location Services is also harmed because, in an attempt to begin competing more effectively, it has been forced pay substantial indemnification to DigitalDog for the income DigitalDog will lose during the year-long period in which it cannot collect LPR data and access LPR data in order to repossess vehicles.

## COUNT I:
### Violation of Section 2 of the Sherman Act (Unlawful Maintenance of Monopoly)

124.    Location Services repeats and re-alleges all allegations in this Complaint, as if fully set forth herein.

125.    DRN possesses monopoly power in the relevant market.

126.    DRN's market share in the relevant market is dominant and sufficiently high to establish a *prima facie* case of monopoly power.

127.    There are significant barriers to entry to the relevant market.

128.    DRN's competitors are unable to expand their output in the short run.

129.    DRN has willfully maintained its monopoly power in the relevant market by the unlawful and exclusionary conduct alleged herein.

130.    DRN's unlawful and exclusionary conduct has had anticompetitive effects, including higher prices and reduced output, in the relevant market.

131.    There are no procompetitive justifications or legitimate business interests for DRN to impose these non-competition restrictions for a full year after an agent terminates its agreement with DRN.

132.    Location Services has suffered antitrust injury from DRN's unlawful and exclusionary conduct.  The harm to Location Services flows from that which makes DRN's conduct unlawful and exclusionary, and is the type of harm that the antitrust laws were intended to prevent.

**COUNT II:**
**Violation of Section 1 of the Sherman Act (Exclusive Dealing)**

133.    Location Services repeats and re-alleges all allegations in this Complaint, as if fully set forth herein.

134.    DRN possesses substantial market power in the relevant market.

135.    DRN's market share in the relevant market is dominant.

136.    There are significant barriers to entry to the relevant market.

137.    DRN's competitors are unable to expand their output in the short run.

138.    DRN's agreements that include the non-competition restrictions alleged herein constitute contracts and agreements between DRN and its vehicle repossession agents.

139.    DRN's agreements with its vehicle repossession agents constitute exclusive dealing agreements prohibiting those agents from working with competing LPR providers during the term of their agreement with DRN.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

1    140.   DRN's agreements with its vehicle repossession agents have a greater

2    exclusionary effect than traditional exclusive dealing agreements because they also prohibit those

3    agents from working with competing LPR providers for a full year after termination of the

4    agreement.

5    141.   DRN's exclusive dealing agreements with its vehicle repossession agents foreclose

6    a substantial percentage of the market to DRN's competitors, as alleged herein.

7    142.   DRN's exclusive dealing agreements with its vehicle repossession agents have

8    caused anticompetitive effects, including higher prices and reduced output, in the relevant market.

9    143.   The anticompetitive effects of these exclusive dealing agreements outweigh any

10   procompetitive effects or justifications.

11   144.   Location Services has suffered antitrust injury from DRN's unlawful and

12   exclusionary conduct.  The harm to Location Services flows from that which makes DRN's

13   conduct unlawful and exclusionary, and is the type of harm that the antitrust laws were intended

14   to prevent.

**COUNT III:**
**Unfair Competition**

15

16

17   145.   Location Services repeats and re-alleges all allegations in this Complaint, as if

18   fully set forth herein.

19   146.   As described herein, DRN has engaged in unlawful and unfair business acts and

20   practices.

21   147.   A substantial portion of the unlawful and unfair acts and practices alleged herein

22   occurred in California, and harm to Location Services has been inflicted in California.

23   148.   DRN's use of an illegal non-competition provision in the DRN Agreement is a

24   violation of §§ 16600 and 17200 of the California Unfair Competition Law.

25   149.   Location Services has been harmed by DRN's unfair competition.

26

27

28

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

**COUNT IV:**
**Cartwright Act (Cal. Bus. & Prof. Code §§ 16700-16770)**

150.    Location Services repeats and re-alleges all allegations in this Complaint, as if fully set forth herein.

151.    DRN possesses substantial market power in the relevant market.

152.    DRN's market share in the relevant market is dominant.

153.    There are significant barriers to entry to the relevant market.

154.    DRN's competitors are unable to expand their output in the short run.

155.    DRN's agreements that include the non-competition restrictions alleged herein constitute contracts and agreements between DRN and its vehicle repossession agents.

156.    DRN's agreements with its vehicle repossession agents constitute exclusive dealing agreements prohibiting those agents from working with competing LPR providers during the term of their agreement with DRN.

157.    DRN's agreements with its vehicle repossession agents have a greater exclusionary effect than traditional exclusive dealing agreements because they also prohibit those agents from working with competing LPR providers for a full year after termination of the agreement.

158.    DRN used its market power as leverage to make vehicle repossession agents accept unreasonable and anticompetitive non-competition terms.

159.    On information and belief, DRN will refuse to work with a vehicle repossession agent who does not agree to DRN's non-competition provision.

160.    DRN's exclusive dealing agreements with its vehicle repossession agents foreclose a substantial percentage of the market to DRN's competitors, as alleged herein.

161.    DRN's exclusive dealing agreements with its vehicle repossession agents have caused anticompetitive effects, including higher prices and reduced output, in the relevant market.

162.    The anticompetitive effects of these exclusive dealing agreements outweigh any procompetitive effects or justifications.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

163.    Location Services has suffered antitrust injury from DRN's unlawful and exclusionary conduct.  The harm to Location Services flows from that which makes DRN's conduct unlawful and exclusionary, and is the type of harm that the antitrust laws were intended to prevent.

## PRAYER FOR RELIEF

WHEREFORE, Location Services prays for judgment as follows:

A.    Adjudge DRN to have violated and to be in continuing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

B.    Adjudge DRN to have violated and to be in continuing violation of the Cartwright Act and California's unfair competition laws.

C.    Enter judgment for Location Services against DRN for the amount of damages sustained by Location Services as a result of DRN's unlawful behavior.

D.    Enter judgment for Location Services against DRN for three times the amount of damages sustained by Location Services as a result of DRN's unlawful behavior, together with the expenses of litigation and cost of this action, including a reasonable attorney's fee, pursuant to 15 U.S.C. § 15, and such other relief as appropriate.

E.    Pursuant to Federal Rule of Civil Procedure 65 and 15 U.S.C. § 26, and California law, enjoin DRN from engaging in further anticompetitive conduct, and limit DRN's exclusivity agreement with vehicle repossession agents to the duration of the agreement between them, and not restrain vehicle repossession agents' ability to work with competing LPR providers after terminating their agreements with DRN.

F.    Grant such other equitable relief, including disgorgement of all unlawfully obtained net revenues that the Court finds just and proper to address and to prevent the recurrence of DRN's unlawful conduct.

G.    For such other and further relief as this Court may deem just and proper.

## Demand for Jury Trial

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 201, Plaintiffs hereby demand a trial by jury on all issues so triable.

PLAINTIFF'S COMPLAINT AGAINST
DIGITAL RECOGNITION NETWORK, INC.

1    DATED:  April 12, 2018                    PERKINS COIE LLP

2

3                                              By: /s/ Donna M. Strain
                                                   Donna M. Strain, Bar No. 305599
4                                                  DStrain@perkinscoie.com
                                                   PERKINS COIE LLP
5                                                  505 Howard Street, Suite 1000
                                                   San Francisco, CA  94105-3204
6                                                  Telephone:    415.344.7000
                                                   Facsimile:    415.344.7050
7
                                                   Jon B. Jacobs (*pro hac vice pending*)
8                                                  PERKINS COIE LLP
                                                   700 13th Street, NW, Suite 600
9                                                  Washington, D.C. 20005-3960
                                                   Telephone: (202) 654-6200
10
                                                   Adam L. Marchuk (*pro hac vice pending*)
11                                                 Mark T. Smith, Bar No. 260845
                                                   Caroline A. Teichner
12                                                 (*pro hac vice pending*)
                                                   PERKINS COIE LLP
13                                                 131 South Dearborn Street, Suite 1700
                                                   Chicago, Illinois 60603-5559
14                                                 Telephone: (312) 324-840060603-5559

15                                                 Attorneys for Plaintiff
                                                   LOCATION SERVICES, LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S COMPLAINT AGAINST
                                         DIGITAL RECOGNITION NETWORK, INC.